# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 7, 2013

## TONY WOLFE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-00559     James C. Beasley, Jr., Judge**

---

**No. W2012-00611-CCA-R3-PC - Filed September 30, 2013**

---

The petitioner, Tony Wolfe, was convicted by a Shelby County Criminal Court Jury of first degree premeditated murder and was sentenced to life imprisonment. Thereafter, he filed a petition for post-conviction relief, alleging that his trial counsel was ineffective. The post-conviction court denied the petition, and the petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Paul K. Guibao (on appeal) and Larry Copeland (at trial), Memphis, Tennessee, for the appellant, Tony Wolfe.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On direct appeal, this court summarized the proof adduced at trial as follows:

> The underlying crime occurred at a Memphis convenience store following an altercation between the [petitioner], the victim, and several other men. The [petitioner] shot and killed the victim when the victim exited the store.
>
> At trial, the [petitioner] asserted that the victim,

Leondous Hawkins, and the two men with Hawkins were members of a gang that shot him in 1997. He contended that the three men displayed weapons to him inside the convenience store. He denied that he waited for the men to exit the store. He said that the trio shot at him and that he then shot at them in self-defense.

State v. Tony Wolfe, No. W2008-01243-CCA-R3-CD, 2009 WL 1025871, at *1-3 (Tenn. Crim. App. at Jackson, Apr. 8, 2009). This court affirmed the petitioner's conviction and sentence. Id.

Subsequently, the petitioner filed a pro se post-conviction petition, alleging numerous grounds for relief, including the ineffective assistance of trial counsel. Attached to his petition was a letter purportedly written by trial counsel on April 15, 2009, which stated:

Please find enclosed herewith a copy of the order from the Court of Criminal Appeals where they upheld your conviction. I am not sure what I am going to do about this yet, but I know I will appeal further. As you know, the Court Reporter altered your transcript and all the errors I testified to on the stand were erased from your transcript. I may file a petition for rehearing for you with the Court of Criminal Appeals, or I will file an application for permission to appeal to the Tennessee Supreme Court on your behalf.

This was a crooked trial, and the appeal was based upon a crooked transcript. You know it, I know it, and I am going to do something about it. If every thing else fails I will testify at a post conviction hearing on your behalf that I was ineffective because I was sleep deprived and that I totally screwed your case up if that is what it takes to get you out of jail.

The record reveals that the petitioner's trial counsel was deceased at the time of the post-conviction hearing.

At the post-conviction hearing, petitioner called David Michael Zak, the assistant district attorney general who prosecuted the petitioner's case. Zak testified that he spoke with trial counsel on various occasions prior to trial. For example, one or two weeks prior to trial, trial counsel informed Zak that he was having trouble viewing the videotape of the crime scene, and Zak assisted counsel in bringing the petitioner into the courtroom to view

the videotape.

Zak stated that trial counsel was provided discovery materials, including the statements from more than six eyewitnesses, photographs, and the videotape. Zak said that the State had to resupply trial counsel with the discovery materials, which were damaged by a flood in trial counsel's office.

Zak stated that the only offer made to the petitioner was to enter a guilty plea to first degree murder and receive a life sentence. He recalled that trial counsel successfully argued that the petitioner was not eligible for a sentence of life without parole because the State failed to timely submit a notice of enhancement.

Zak said that the petitioner's trial occurred the second week in December 2006. The petitioner required dialysis treatments every other day; therefore, the trial proceedings began around 11:00 a.m. or noon and ended around 9:00 p.m. on those days. Zak acknowledged that the situation was unusual, that there were "issues in terms of how late the jury was staying," and that trial counsel raised those issues in his motion for new trial.

Zak stated that trial counsel's teenage son had been in a bus accident the week of trial but that counsel "was fine with that." Additionally, counsel was on medication. Zak said, "[T]hat was all in the motion for new trial when he testified." The prosecutor recalled that trial counsel was assisted by co-counsel during approximately ninety percent of the trial.

Zak said that he was aware of trial counsel's style and that trial counsel "was known [to] go around in circles before he got to certain issues." Trial counsel acted consistently with his normal practice during the petitioner's trial. Zak said:

> He was raging against the machine. He was walking up and down and making his points. He was showing the jury that he was animated and fully invested in this case.

Regardless, because of the strength of the State's case, the jury "had no reason to consider self-defense."

Zak acknowledged that trial counsel complained to the trial court about the lateness of the trial, his sleepiness, and his difficulty concentrating due to the medication. Zak said, however, that the petitioner's dialysis "changed everything." Zak could not detect that trial counsel was suffering any side effects from medication, noting that "[h]e was alert as he was at ten p.m. as he was at ten a.m." Zak stated that the trial court once "admonished [trial counsel] that he understood that there was medication involved but he couldn't do anything

about it since the fact that [trial counsel] was still practicing and doing as well a job as he was." Zak said that trial counsel would complain about being tired and unable to concentrate "when it was convenient."

Zak acknowledged that at one point, the trial court refused to allow trial counsel to practice in his court but rescinded the order approximately two years later.

On cross-examination, Zak said that trial counsel had all of the Jencks material prior to trial. Trial counsel argued motions prior to trial and made numerous objections during trial. Trial counsel

> stated on the record quite a few times that he was going to take every witness very slowly and cross examine them methodically. If this case took three weeks, it would take three weeks. He – that was part of his plan, which – which was to extend this trial as much as possible, and he did that on cross examination.

Zak stated that trial counsel passionately argued points to the trial court and the jury. Trial counsel never appeared to have difficulty arguing and was usually "spot on. He was saying what he wanted to say in front of the jury and they were listening to him." Zak said that trial counsel attempted to establish that the victim and the victim's friend shot at the appellant first. In support of this defense strategy, trial counsel tried to show that the video "wasn't giving you the full story" by going frame by frame through the video while asking the witnesses who were present during the crime to explain what was happening off camera. Trial counsel tried to convince the jury that "[w]hat was happening off camera was as important or more important than what was happening on camera." Zak opined that trial counsel's trial strategy was "brilliant" and was the only one available based on the proof. However, the jury did not believe the claim of self-defense.

On redirect examination, Zak asserted that the trial court tried to accommodate trial counsel's needs by allowing him breaks to eat or to speak with the petitioner, co-counsel, or witnesses. Zak said that near the end of the trial, the trial court agreed to start the proceedings at 11:30 a.m. to allow trial counsel a minimum of ten hours to sleep. Zak stated that trial counsel's "strategy was to extend everything as much as possible." Zak never saw any indication that trial counsel was sleepy and did not recall ever seeing him yawn during trial. Zak said that trial counsel "was on his game, he was in front of that jury . . . there was never a moment where he wasn't giv[ing] a hundred percent in what he was doing at that moment." He noted that he and trial counsel engaged in a "screaming match[]" at one point during the trial outside the presence of the jury.

Zak said that trial counsel never said on the record or off the record that he was ineffective. In fact, during the motion for new trial, Zak asked counsel if he had been ineffective, and counsel responded that he had not been ineffective. However, counsel did state that he was having trouble sleeping, that he was taking medication for the problem, and that he was unable to take the medication because of the unusual hours during which the trial was taking place. Zak said that even though the petitioner had been having dialysis treatments for a while, the trial court was not apprised of his need for treatment during normal trial hours until after the jury was selected. Zak also recalled that on the nights the court worked late, the court would pause the proceedings for dinner breaks.

Zak stated that the State's proof at trial was overwhelming. Specifically, he noted that two survivors of the assault and two or three other witnesses testified, and a video from the crime scene depicted the petitioner "basically making the kill shot against [the victim] as he laid on the ground." Trial counsel cross-examined and attempted to impeach the witnesses, and the petitioner testified to establish self-defense. Trial counsel's requests that the jury visit the crime scene and that the petitioner expose scars to the jury to establish why he acted in self-defense were denied. Zak said these actions demonstrated that trial counsel "was on his game." Trial counsel repeatedly said that "he would uncover every stone . . . if it took all week."

The petitioner testified that he rarely saw trial counsel before trial and that trial counsel did not visit him in jail until the week of trial. Trial counsel did not tell the petitioner about investigating the case. The petitioner stated that when trial counsel informed him that counsel was on medication, co-counsel began assisting him during trial. The petitioner did not meet co-counsel prior to trial.

The petitioner said that he was concerned about the lack of communication with trial counsel, noting that he wanted counsel to know that he acted in self-defense because of an "ongoing feud" between himself and the victims. The petitioner wanted trial counsel to inform the jury that the victims were members of a gang and that the petitioner was formerly a member of the same gang. The petitioner said the victims shot him when he "denounce[d]" the gang. Since being shot, the petitioner had to undergo dialysis treatments. The petitioner stated trial counsel wanted the petitioner to show his scars from the shooting at trial, but the trial court would not allow it. The petitioner said that after he was shot, he was put in prison and the victims threatened to kill him when he was released. However, the jury was not told of the threat because the petitioner was unable to contact the witness he told about the threat. The petitioner said that trial counsel told him that as part of the trial strategy, he could ask the petitioner questions to elicit proof about the prior threat. Regardless, trial counsel did not ask the necessary questions on direct examination. He acknowledged that his sister testified about the victims' gang membership and their shooting of the petitioner.

The petitioner said that trial counsel did not make many objections during trial. Additionally, trial counsel was on medication and would "nod out." The petitioner said that he had to wake trial counsel at least twice to ensure he was paying attention but that trial counsel seemed disoriented. Trial counsel asked the court for a continuance because he felt that he could not handle the trial. The trial court denied the continuance but asked if trial counsel wanted a mistrial. Trial counsel responded, "I'm just saying I need to be able to take this medicine or whatever." The petitioner said trial counsel cross-examined witnesses and would "stumble and bumble so long" that the trial court insisted that counsel proceed more quickly. The petitioner said trial counsel did not say that he intended to be thorough "just for the sake of being a good lawyer" but because he felt rushed by the trial court.

The petitioner said that trial counsel woke the petitioner twice when he fell asleep during trial because of exhaustion from his dialysis treatments. The petitioner said that on the days of his treatments, the trial lasted until 11:00 p.m. On the days he did not get treatment, the trial started around 10:00 or 10:30 a.m. and lasted until 10:00 p.m. The petitioner said one juror closed her eyes during trial. He asked trial counsel if the juror was paying attention, and trial counsel "noted it down that she had her eyes closed."

The petitioner stated that during the trial, the State committed prosecutorial misconduct by showing the jury the video of the petitioner shooting the victim when trial counsel requested other scenes be shown. Additionally, the petitioner complained that the State failed to show the jury the photographs that supported the defense.

The petitioner acknowledged that his medical records were admitted at trial to demonstrate that the victims had shot him six times after he left the gang.

On cross-examination, the petitioner maintained that although he testified at trial, he "didn't get to tell the jury what I felt needed to be related so they could understand the circumstances of my case." The petitioner said that he answered the questions that were asked and did not tell the jury about being shot by the victims or about being in the gang. He said that trial counsel requested the trial court's permission to ask about the prior threats and gang affiliations but that the trial court would not allow it. The petitioner said that

> once [trial counsel] let the judge know that he was on medication and he was sleep deprived and he was feeling like this or that, the judge told him to do the best he can and that's what I felt like he tried to do. He didn't do the best he could, because if he did, I wouldn't be faced with life.

The petitioner said that the theory of defense was self-defense and that trial counsel argued

that theory. During closing argument, trial counsel also tried to persuade the jury to, at most, convict the petitioner of a lesser-included offense. The petitioner acknowledged that trial counsel cross-examined the witnesses.

The letter purportedly written by trial counsel was never made a formal exhibit at the post-conviction hearing.

After the post-conviction hearing, the post-conviction court[1] entered an order, denying relief. The post-conviction court stated it had listened to the testimony of the petitioner and the prosecutor and read the trial transcript and the opinion of this court on direct appeal. The court determined that trial counsel

> presented a very thorough, meticulous and detailed defense in this case. He cross examined each witness thoroughly. He argued issues on behalf of his client. He made many motions to the court on behalf of his client. He vigorously defended his client. There were many confrontations between the parties to this trial. The issues about the hours the court was in session and the reason for those unusual hours were addressed on appeal. The trial court found that [trial counsel] was effective in his representation. Likewise this [c]ourt has seen or heard no proof that would indicate that [trial counsel] did not zealously and effectively represent the [p]etitioner. . . . [Additionally, this] case was heatedly contested by both sides but the proof was overwhelming as to [the petitioner's] guilt.

On appeal, the petitioner challenges the ruling of the post-conviction court.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved

---

[1]The post-conviction judge was not the same judge who presided over the petitioner's trial.

by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the petitioner maintains that trial counsel should have shown the jury evidence that the victims were members of a gang who had previously shot him and that, therefore, he acted in self-defense. We note that on direct appeal, this court said:

> At trial, the [petitioner] asserted that the victim, Leondous Hawkins, and the two men with Hawkins were members of a gang that shot him in 1997. He contended that the three men displayed weapons to him inside the convenience store. He denied that he waited for the men to exit the store. He

said that the trio shot at him and that he then shot at them in self-defense.

State v. Tony Wolfe, No. W2008-01243-CCA-R3-CD, 2009 WL 1025871, at *1 (Tenn. Crim. App. at Jackson, Apr. 8, 2009). In other words, the record reveals that the jury heard the evidence the petitioner wanted them to hear. Accordingly, there is no evidence that trial counsel was ineffective in this regard.

The petitioner's chief complaint seems to be that counsel was ineffective by being sleep deprived and "out of it" during trial. Specifically, the petitioner argues that

> the admission of counsel in the letter made exhibit to the hearing was in a sense testimony from the grave. But that admission was not unsupported, as counsel set this record from the trial on as he felt that the conditions for trial impaired his ability to represent his client. In this matter, the [petitioner's] conviction if sustained without retrial is tainted by the cloud of his trial counsel's statements, especially in light of the serious nature of the charge and sentence in this case. Justice demands that [the petitioner] receive a new trial in the matter.

We acknowledge that in the letter, counsel stated that he was sleep deprived during the trial; however, we note that the letter does not state specifically what counsel could have done or failed to do because he was sleep deprived. Therefore, the letter contains no specific allegation of deficiency or prejudice the petitioner may have suffered by the alleged deficiency and fails to establish that counsel was ineffective.

Further, the post-conviction court stated that this issue was addressed on direct appeal. Specifically, this court's opinion on direct appeal reveals that trial counsel contended that the "trial court . . . conduct[ed] the trial under unreasonable hours 'for no good reason,' . . . which rendered [trial counsel] tired and unable to concentrate." Id. at *4. On the third day of trial, after the trial court stated an intention to work late that evening,

> [t]rial counsel informed the court that he was taking medicine that might affect his ability to work longer hours and might render him ineffective. The trial court asked counsel if he wanted a mistrial, and he declined. He said he felt fine but surmised that he could only work until 8:30 p.m. that day. The record reflects that the court adjourned sometime after 10:00 p.m., after trial counsel concluded his direct examination of the

defendant. The State objected that trial counsel had deliberately engaged in time-consuming irrelevant questioning to circumvent the State from conducting an immediate cross-examination.

Trial counsel did not complain that the late hour was affecting his ability to represent his client. The record reflects that trial counsel stated that he was being "thorough" in his direct examination. The record further reflects that the trial court took a long dinner break and several additional breaks throughout the day.

Id.

Moreover, at the post-conviction hearing Assistant District Attorney General Zak testified that trial counsel was thorough in his cross-examination of witnesses and "brilliant" in his presentation of the theory of defense. Additionally, the proof against the petitioner was overwhelming. Several witnesses to the shooting testified at trial, and the State played for the jury a video of the shooting. The jury heard the petitioner's claim of self-defense and rejected it. The post-conviction court found that there was no evidence that trial counsel's performance was diminished by the hours of the trial or by any alleged sleep deprivation. To the contrary, the court found that counsel's representation was thorough, meticulous, and detailed and that he zealously and vigorously defended the petitioner. The record does not preponderate against this finding.

### III. Conclusion

In sum, we conclude that the petitioner has failed to prove that his counsel was deficient or that he was prejudiced by any alleged deficiency. Therefore, the post-conviction court did not err in denying relief. The judgment of the post-conviction court is affirmed.

_____
NORMA McGEE OGLE, JUDGE

-10-